UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ERIN GARDNER,<br><br>Plaintiff,<br><br>v.<br><br>UNIVERSITY OF CONNECTICUT HEALTH CENTER,<br><br>Defendant. | ) | 3:12-cv-01168-GWC |

**OPINION AND ORDER RE:**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
**(Doc. 33)**

Plaintiff Erin Gardner brings this action against Defendant University of Connecticut Health Center Correctional Managed Health Care ("UCHC CMHC"), alleging disability discrimination in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 791 *et seq.* Defendant has moved for summary judgment on this claim, and the court heard argument on the motion on July 29, 2016. For the reasons discussed below, Defendant's Motion for Summary Judgment (Doc. 33) is GRANTED.

## **Undisputed Facts**

### I. Plaintiff's Seizure Disorder

Plaintiff suffers from a seizure disorder, which first manifested itself in 1999. (Doc. 1 at ¶ 15.) Plaintiff typically experiences one seizure in her sleep every three to four months. (*Id.* at ¶ 16.) Plaintiff cannot control when she has seizures, but they are always preceded by at least one "aura" one to twelve hours before.[1] (*Id.* at ¶¶ 17–18; Doc. 33-4 at 19.) Plaintiff has been informed by others that she acts confused and not like herself after having a seizure. (Doc. 33-4 at 18.) Plaintiff does not recall these moments. (*Id.*) She only becomes aware that she has

---

[1] Plaintiff describes an "aura," as a "momentary, yet distinct feeling similar to déjà vu and anxiety." (Doc. 1 at ¶ 17.)

suffered a seizure after it has ended. (Doc. 1 at ¶ 19.) She has been prescribed medication to control her seizures. (*Id.* at ¶ 20.)

## II. Plaintiff's Job at UCHC CMHC

On December 30, 2011, Defendant hired Plaintiff as a clinical social worker ("CSW") assigned to York Correctional Institution. (Doc. 1 at ¶ 12.) York is a high security all-female correctional institution that houses maximum security inmates. (Doc. 33-6 at ¶ 5.) Correctional officers ("COs") do not escort staff around the York compound. (*Id.* at ¶ 8.) Plaintiff's position was considered a hazardous-duty position. (Doc. 33-5 at ¶ 8.) The job posting for her position noted a risk of injury from assaultive and/or abusive inmates, and a requirement of possibly having to lift and/or restrain inmates. (*Id.* at 6.)

As a CSW, Plaintiff was required to work directly with inmates in the prison environment. (*Id.* at ¶ 9.) She was tasked with providing them clinical treatment services, including mental health assessments, screenings, and group therapy sessions. (Doc. 33-4 at 6.) When CSWs meet with inmates inside a clinic room, COs might not be aware of what is happening. (Doc. 33-6 at ¶ 11.) It is not the practice of York to have COs stationed inside or outside such rooms. (*Id.* at ¶ 10.)

## III. Incident on June 21, 2012

On June 21, 2012, Plaintiff had a "partial seizure"[2] while on duty in the Outpatient Medical Unit at York. (Doc. 1 at ¶ 22.) She attributes this daytime seizure to having lower

[2] In her opposition to the instant motion Plaintiff attempts to deny Defendant's characterization that she suffered an actual "seizure," (Doc. 42 at ¶ 19), admitting to only suffering "seizure symptoms." (Doc. 40 at 3.) The ultimate characterization of Plaintiff's medical event is one of semantics; the parties do not dispute that Plaintiff suffered a medical incident related to her seizure disorder on the date in question. However, the court does not consider the characterization to be properly disputed for two reasons. First, Plaintiff admitted to having a "partial seizure" in her Complaint, (Doc. 1 at ¶ 22), and the court is permitted to consider the pleadings on a motion for summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (citing Fed. R. Civ. P. 56(c)). Additionally, Plaintiff acknowledged in her deposition that the event "might have been a seizure," (Doc. 41-2 at 12), and "a party opposing summary judgment does not create a triable issue by denying his previously sworn statements." *See Heil v. Santoro*, 147 F.3d 103, 110 (2d Cir. 1998) (citation omitted).

levels of medication in her system as a result of gastrointestinal issues prompted by a temporary diet change. (*Id.* at ¶¶ 21–22.) Plaintiff was with an inmate at the time of the incident. (*Id.* at ¶ 23.) Plaintiff only became aware that she had had a seizure when the inmate asked Plaintiff if she was all right, calling attention to the fact that Plaintiff had lost control of her bladder. (*Id.* at ¶ 24.) The inmate also informed Plaintiff that during the incident Plaintiff had "zoned out" and started grinding her teeth for a few moments. (*Id.* at ¶ 25.) Plaintiff had facility keys on her person at the time of the seizure. (Doc. 33-4 at 22.)

After the seizure, Julie Kulp, the Correctional Head Nurse Supervisor, noticed Plaintiff walk slowly toward a CO's desk. (Doc. 33-7 at ¶ 6.) Her pants were wet. (*Id.*) When Ms. Kulp asked Plaintiff if she was okay, Plaintiff responded, "I'm wet. I have seizures." (*Id.*) Ms. Kulp took Plaintiff to a back room, took her vital signs, and provided her with a change of clothes. (*Id.* at ¶ 7.) She noticed that Plaintiff was not acting completely like herself. (*Id.* at ¶ 8.) Ms. Kulp then spoke with the inmate who had witnessed the seizure and was informed that Plaintiff had been unresponsive during the incident.[3] (*Id.* at ¶ 10.) Shortly thereafter, Ms. Kulp completed a medical incident report and drove Plaintiff home. (*Id.* at ¶ 11.)

## IV. Events Subsequent to the June 21 Incident

On June 26, 2012, Plaintiff was placed on paid administrative leave pending a "fitness for duty" evaluation. (Doc. 33-5 at ¶ 10.) The purpose of such an evaluation is to determine whether the individual is capable of performing the essential functions of her job in the particular job setting. (Doc. 33-8 at ¶ 6.)

On June 27, 2012, Plaintiff's evaluation was conducted by Doctor Mark Buchanan, Director of Work Life Initiatives in UCHC CMHC's Occupational Health Division. (*Id.* at ¶¶ 3, 9.) Dr. Buchanan interviewed Plaintiff about her recollection of the June 21 incident, as well as her medical history as it related to her seizure disorder and neurologic treatment. (*Id.* at ¶ 10.) He determined that Plaintiff experienced recurrent seizures as a result of her seizure

[3] Though Plaintiff admits most of what the inmate said both in her Complaint as well as in her Rule 56 statement, she objects to this particular statement on the grounds that it is hearsay. Defendant responds that the statement is not hearsay because it is only being offered to show the effect it had on Defendant when making decisions about Plaintiff's employment. *See* Fed. R. Evid. 801(c). The court agrees with Defendant and finds the statement to be admissible.

disorder. (*Id.* at ¶ 11.) He also reviewed Ms. Kulp's medical incident report and interpreted it as indicating that Plaintiff had been disoriented after her seizure. (*Id.* at ¶ 10; Doc. 33-9 at 10–11.) In assessing her fitness for duty, Dr. Buchanan considered all of this information "in light of the fact that [Plaintiff] held a hazardous-duty position at York that required her to work directly with inmates in the prison environment." (Doc. 33-8 at ¶ 10.) He also took account of UCHC CMHC's policy regarding hazardous-duty employees.[4] (*Id.*)

Ultimately, Dr. Buchanan concluded that Plaintiff suffered an unanticipated "loss of seizure control" while on duty on June 21. (*Id.* at ¶ 11.) He concluded:

> Based on my individualized medical judgment, . . . Plaintiff was not fit for duty because her seizure disorder and the likelihood of a recurrence of the June 21st seizure incident created a safety and security risk, making it dangerous for her to continue to work in the hazardous-duty prison environment, both for herself and for others.

(*Id.* at ¶ 12.) Dr. Buchanan also noted in his post-evaluation report that he informed Plaintiff that "[s]tandard UConn Occupational Medicine Clinic approach to seizure disorder is that this is a disqualification from the hazardous duty environment of CMHC." (*Id.* at 12.) On June 28, 2012, Plaintiff was informed that her employment was being terminated. (Doc. 1 at ¶ 36.)

## Analysis

### I. Summary Judgment Standard

A party is entitled to summary judgment when it shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts" are those that, under the applicable substantive law, "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a "material fact" is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* A party opposing a properly pleaded summary judgment

---

[4] UCHC CMHC has a policy which states, "CMHC candidates with history of seizure disorder and currently on medication for seizures will not be cleared for work." (Doc. 42-1 at 15.) This policy applies to any candidate for employment who would have contact with inmates. Though Plaintiff contends she disclosed her disorder fully to Defendant at the time of her hiring, she was somehow hired for her position on the basis of having no work restrictions. (Doc. 1 at ¶¶ 13–14; Doc. 14 at ¶¶ 13–14.)

motion "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 256 (citations omitted). If the nonmovant offers evidence that "is merely colorable, or is not significantly probative, summary judgment may be granted," *id.* at 249–50 (citations omitted), but "all ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir. 1994) (citation omitted).

## II. The Rehabilitation Act

The Rehabilitation Act provides, in relevant part, "[n]o otherwise qualified individual with a disability in the United States, . . . shall, solely by reasons of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a). The Rehabilitation Act incorporates the same standards as does Title I of the Americans with Disabilities Act ("ADA"), and therefore courts look to the ADA and cases interpreting the ADA for guidance in resolving Rehabilitation Act claims. *See* 29 U.S.C. § 794(d); *see also Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003).

Claims of intentional discrimination pursuant to the Rehabilitation Act are subject to the burden-shifting analysis set forth by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 48–49 (2d Cir. 2002). Under this framework, a plaintiff-employee must first establish a prima facie case of discrimination. *See Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718, 722 (2d Cir. 1994). If she does, the burden then shifts to the defendant-employer. *See id.* If the defendant asserts a neutral reason for its employment decision, unrelated to the plaintiff's disability, then its burden is to "articulate a legitimate non-discriminatory reason for discharging the employee." *Id.* (citation omitted). The burden then shifts back to the plaintiff to prove that the proffered reasons are pretextual. *See id.* If, however, the defendant relies on the plaintiff's disability as a reason for taking the adverse employment decision, then the defendant has the burden "to rebut the inference that the handicap was improperly taken into account by going forward with evidence that the handicap is relevant to qualifications for the position." *Id.*

(citation omitted). "The plaintiff bears the ultimate burden of proving by a preponderance of the evidence that she is qualified despite her handicap." *Id.* (citation omitted).

### III. Plaintiff's Rehabilitation Act Claim

In order to establish a prima facie case of discrimination under the Rehabilitation Act, Plaintiff must show that: 1) she is an individual with a disability within the meaning of the Rehabilitation Act; 2) she was "otherwise qualified" to perform her job; 3) she suffered an adverse employment action on the basis of her disability; and 4) the defendant receives federal funds. *See id.* at 722.

Here, the only element in dispute is the second one, whether Plaintiff was "otherwise qualified" to perform the essential functions of her job. A "qualified individual" is defined as "an individual who, with or without a reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); *see Simms v. City of N.Y.*, 160 F. Supp. 2d 398, 405 (E.D.N.Y. 2001) (applied to Rehabilitation Act claim). In determining whether a plaintiff can perform the essential functions of her job courts "must give considerable deference to an employer's judgment regarding what functions are essential for service in a particular position." *D'Amico v. City of N.Y.*, 132 F.3d 145, 151 (2d Cir. 1998) (citations omitted). Courts "necessarily must consider both the type of position for which the plaintiff claims to be otherwise qualified, and the consequences of a potential mishap." *Id.* (citation omitted).

#### A. Direct Threat Defense Generally

Plaintiff contends she was otherwise qualified to perform the essential functions of a CSW with UCHC CMHC. Defendant contends that she was not, raising a "direct threat" defense.[5]

---

[5] "In cases where the essential function and direct threat analyses are inextricably intertwined, some courts have placed the burden of both inquiries on the plaintiff." *Nelson v. City of N.Y.*, No. 11 Civ. 2732(JPO), 2013 WL 4437224, at *9 (S.D.N.Y. Aug. 19, 2013) (citation omitted). Others have placed the combined burden on the defendant. *See E.E.O.C. v. Browning-Ferris, Inc.*, 262 F. Supp. 2d 577, 586 (D. Md. 2002). The Second Circuit has not spoken directly on this issue, but it has held that "the employer generally bears the burden of demonstrating that a

An individual is not "otherwise qualified" if she poses a "direct threat," or a "significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3); *see Johnson v. Maynard*, No. 01 Civ. 7393(AKH), 2003 WL 548754, at *5 (S.D.N.Y. Feb. 25, 2003). "The direct threat defense must be 'based on a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence,' and upon an expressly 'individualized assessment of the individual's present ability to safely perform the essential functions of the job . . . .'" *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 86 (2002) (quoting 29 C.F.R. § 1630.2(r)); *see also Bragdon v. Abbott*, 524 U.S. 624, 649–50 (1998) (assessment of direct threat must be objectively reasonable). Relevant factors to be considered include: (1) the duration of the risk; (2) the nature and severity of the potential harm; (3) the likelihood that the potential harm will occur; and (4) the imminence of the potential harm. *See Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 220 (2d Cir. 2001). Where the record demonstrates that an employee poses a direct threat, summary judgment in favor of the employer is appropriate. *See Adams v. Rochester Gen. Hosp.*, 977 F. Supp. 226, 233–34 (W.D.N.Y. 1997) (citations omitted).

### B. Direct Threat Defense as Applied to Plaintiff

The court finds that Defendant has met its burden of establishing that Plaintiff was not "otherwise qualified" for her hazardous-duty position at York. The undisputed facts show that Defendant's determination that Plaintiff posed a "direct threat" was both objectively reasonable and made after an individualized assessment.

#### 1. Objective Reasonability

It is undisputed that Plaintiff experiences recurrent seizures as a result of her disorder. Plaintiff cannot control when she has seizures. Though the majority of Plaintiff's seizures occur in her sleep, it is undisputed that she experienced an unanticipated medical event related to her disorder while at work. During this incident, Plaintiff "zoned out" and was temporarily unresponsive, only becoming aware that she had experienced a seizure after an inmate asked her if she was all right and alerted her to the fact that she had become incontinent.

---

plaintiff poses a 'direct threat' to herself or others." *Nelson*, 2013 WL 4437224, at *9 (citing *Hargrave v. Vermont*, 340 F.3d 27, 35 (2d Cir. 2003)).

It is also undisputed that an essential function of Plaintiff's hazardous-duty position was to work with inmates in the prison environment outside the presence of COs. In this role, Plaintiff could come into contact with maximum security inmates with violent tendencies on any given day. Plaintiff admits that "[i]n the prison setting, dangerous situations, including serious injuries and security breaches, can occur in seconds," and that the loss of facility keys would be one such serious threat to security and safety. (Doc. 33-6 at ¶¶ 14, 15.)

After meeting with Plaintiff, Dr. Buchanan concluded, based on his medical judgment, that Plaintiff's seizure disorder and the likelihood that she could have another seizure created a safety risk in the hazardous-duty prison environment. The undisputed facts establish that this risk assessment was objectively reasonable. Being incapacitated for any extent of time in a setting as uniquely hazardous as York is clearly dangerous both to Plaintiff and to her co-workers and inmates. Dr. Buchanan specifically notes that he took all of the above information into account when making his assessment. He relied on Plaintiff's own recollection of the incident, as well as statements made by the inmate-witness and Ms. Kulp.[6]

Critically, Plaintiff does not offer conflicting expert testimony concerning her condition or the likelihood that she would experience another seizure on the job. *Cf. Pesce v. N.Y.C. Police Dep't*, 12cv8663 (DLC), 2016 WL 468244, at *7 (S.D.N.Y. Feb. 5, 2016) (summary judgment denied where parties offered conflicting medical evidence as to whether plaintiff's epilepsy posed direct threat). There is no medical evidence in the record to rebut Dr. Buchanan's opinion or to indicate that the risk of Plaintiff having another unanticipated medical event that

---

[6] Plaintiff contends that the interpretations Dr. Buchanan drew from Ms. Kulp's report were not objectively reasonable. Specifically, she takes issue with his statement that the report indicated to him that, after her incident, Plaintiff "was not talking normally, seemed to be disoriented, . . . and had to be directed a couple of times to change clothes . . . ." (Doc. 49-1 at 9.) The court disagrees. The report explicitly states that Plaintiff was "still a little post-ictal" after the incident and that she "needed several reminders to go to the bathroom to get changed out of her wet clothes." (Doc. 33-8 at 7.) It was not objectively unreasonable for Dr. Buchanan to take these assessments at face value when considering Ms. Kulp's report. It was also objectively reasonable for him to interpret Ms. Kulp's observations that Plaintiff was speaking in a hushed voice and repeating herself as indicating that Plaintiff was not speaking normally after the incident. The court agrees with Plaintiff that factual disputes exist as to the reasons underlying the behavior observed by Ms. Kulp, but these disputes are immaterial. Even assuming Plaintiff was fully oriented *after* the incident, it remains undisputed that *during* the incident she was rendered temporarily incapacitated while alone with an inmate.

would affect her ability to remain alert and communicative while working with inmates was unlikely or remote. *See Hutton v. Elf Atochem N. Am., Inc.*, 273 F.3d 884, 894 (9th Cir. 2001) (affirming summary judgment for employer based on direct threat defense where no physician could rule out occurrence of hypoglycemic event that would affect plaintiff's ability to remain conscious and alert in his role as chemical finishing operator).

Instead, relying predominantly on her own deposition testimony, Plaintiff makes several arguments as to why it was not objectively reasonable to consider her particular condition a direct threat. First, she contends that her seizure posed an insignificant risk because it was of a short duration. However, as noted by York's Deputy Warden, who was "personally aware of instances of inmates causing serious injury to staff and other inmates . . . at York," a few seconds is all it takes to cause serious injury or a security breach in the prison environment. (Doc. 33-6 at ¶¶ 14, 16.) The risk presented by a spell of unresponsiveness by a staff member in a high security prison is obvious. Plaintiff's personal belief that she and others remained safe does not create a triable jury issue.

Plaintiff also argues that although a risk of harm might exist, it is too remote to warrant her disqualification. In so doing she notes that her seizures predominantly happen while she is asleep and are reliably anticipated by an aura. She also asserts, without offering medical evidence, that she would not suffer another daytime seizure so long as she maintains her medication levels.

The court finds that these factors do not render the Defendant's direct threat determination objectively unreasonable. First, Plaintiff's medical records from November 2012 indicate that while her seizures had been "exclusively nocturnal . . . more recently diurnal seizures have occurred," despite Plaintiff's medication compliance. (Doc. 41-1 at 4.) Her doctor described these non-nocturnal seizures as "a different type," resulting in a "[s]ense of déjà vu with behavioral arrest and loss of contact." (*Id.* at 6, 8.) Clearly, then, the risk that Plaintiff might experience another non-nocturnal seizure and suffer a loss of contact while on duty was real, and it was not unreasonable for Defendant to consider this risk in making its direct threat assessment.

Second, though Plaintiff argues that her auras allow her to reliably anticipate her seizures, the record reflects that this is not entirely accurate. While it is true that Plaintiff always experiences an aura before suffering a seizure, sometimes the time between the two events is many hours, and other times, like on June 21, it is a much more compressed window. Plaintiff acknowledges in her Complaint that her seizures are preceded by auras that happen between one and twelve hours before. (Doc. 1 at ¶ 18.) Accordingly, the occurrence of an aura does not, by itself, allow Plaintiff to reliably predict when she will be incapacitated.

Last, Plaintiff offers no medical evidence in support of her belief that she would not have another daytime seizure so long as she maintained her medication levels. She also offers no evidence to dispute Dr. Buchanan's testimony that medication adherence is not a reliable way to diminish risk because a number of variables, including human error, can affect a medication's efficacy at any given time. (Doc. 49-1 at 13–14.)

Moreover, even if the likelihood of Plaintiff experiencing another seizure at work is small, the severity and the scale of the potential harm to Plaintiff and others poses a significant risk. *See Wurzel v. Whirlpool Corp.*, 482 F. App'x 1, 15 (6th Cir. 2012) ("[C]ourts evaluating individuals whose conditions might cause them to be incapacitated tend to focus on the risk related to the workplace." (citations omitted)); *Donahue v. Consol. Rail Corp.*, 224 F.3d 226, 231 (3d Cir. 2000) (noting that "[i]f the threatened harm is grievous . . . even a small risk may be 'significant'). Plaintiff was not a social worker in a school setting or employed as a store clerk. *Cf. Lovejoy-Wilson*, 263 F.3d at 220–21 (convenience store employee's epilepsy did not render her direct threat to health or safety of other individuals in her workplace); *E.E.O.C. v. Kinney Shoe Corp.*, 917 F. Supp. 419, 429 (W.D. Va. 1996) (plaintiff with epilepsy did not pose direct threat in his job as salesperson in part because nature and severity of harm was "de minimis"). Rather, Plaintiff worked in a hazardous environment in which, as testified to by Dr. Buchanan, serious harm has been known to befall other health personnel at the hands of inmates within a matter of seconds. (Doc. 49-1 at 16–17.)

Courts have found "direct threat" to be established in cases involving similar risks of serious harm. For example, in *Dicksey v. New Hanover Cty. Sheriff's Dep't*, 522 F. Supp. 2d 742, 748 (E.D.N.C. 2007), the court found that the plaintiff was not qualified for the position of deputy sheriff/detention officer, in part, because his seizure disorder posed a direct threat.

Though the plaintiff had only had one seizure while at work, the court found that he was unable to perform the essential functions of the position for which he was hired. *Id.* at 745, 748. Stating that "[o]ne can only imagine the danger that could result from an armed law enforcement officer experiencing an epileptic seizure while trying to effect an arrest or subdue a suspect," the court noted that the plaintiff had offered no evidence to support his claim that he was unlikely to have another seizure at work if granted a reasonable accommodation. *Id.* at 748–49.

In another case, *Hutton*, the plaintiff, in his role as a chlorine finishing operator, was tasked with operating equipment that produced, stored, and transferred liquid chlorine. *See* 273 F.3d at 886. The plaintiff was a diabetic and had experienced hypoglycemic episodes and one seizure while on duty. *See id.* at 886–87. The Ninth Circuit acknowledged the plaintiff's arguments that he had only lost consciousness once while at work and the potential for harm was small given safety features on the equipment. *Id.* at 893–94. Nevertheless, the court concluded that he posed a significant risk under the direct threat framework, noting both his medical history and the fact that "a significant physical or mental lapse by [plaintiff] as a result of a diabetic episode could result in substantial harm to his co-workers and others." *Id.* at 894; *see also Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1094 (5th Cir. 1996) (chemical process operator who was diabetic was unqualified for his position because "[a]ny diabetic episode or loss of concentration occurring while operating . . . machinery or chemicals had the potential to harm not only himself, but also others").

Here, the undisputed facts demonstrate that by losing continence, zoning out, and only becoming aware of what had happened through an inmate's response, Plaintiff exhibited a loss of control and awareness on June 21. The possibility that Plaintiff, who experiences recurrent seizures, might experience another unanticipated medical event while on duty creates a significant safety and security risk in the specific context of the hazardous-duty prison environment. The unrefuted testimony of Dr. Buchanan is that patterns of recurrence may be unpredictable. (Doc. 33-9 at 15.) Working directly with inmates, an essential function of the CSW position, requires continuously vigilant and communicative staff. Given the severe consequences that could result if Plaintiff were to experience another seizure while on duty, the court finds that Defendant's assessment of Plaintiff as a direct threat was objectively reasonable.

**2. Individualized Assessment**

Plaintiff also argues that Defendant cannot prevail on its direct threat defense because it did not conduct an individualized assessment of Plaintiff. Plaintiff contends that her termination occurred on the basis of Defendant's blanket policy of excluding all individuals with a history of seizure disorder who are currently on medication from positions involving inmate contact.

The court finds this argument to be unpersuasive. While it is true that Defendant has such a policy, the undisputed facts show that Dr. Buchanan conducted an individualized assessment of Plaintiff before determining that she posed a safety and security risk. Dr. Buchanan met with her, considered her particular condition, took into account her medical history related to her seizure disorder and neurologic care, and went over the specific events of June 21, both with Plaintiff based on her own recollection and by reviewing Ms. Kulp's report. These facts are quite distinct from those present in other cases where the application of a blanket exclusion policy has been deemed impermissible. *Cf. Stillwell v. Kansas City, Mo. Bd. of Police Comm'rs*, 872 F. Supp. 682, 683, 686–87 (W.D. Mo. 1995) (across-the-board exclusion of all one-handed applicants for private security guard license "*by simply assuming*" that they cannot meet physical eligibility requirements "runs afoul" of required individualized assessment (emphasis added)); *Sarsycki v. United Parcel Serv.*, 862 F. Supp. 336, 341 (W.D. Okla. 1994) (blanket regulation that barred insulin-dependent diabetics from driving motor vehicles without consideration of the individual's specific limitations and abilities was impermissible).

Plaintiff seeks to create a dispute of fact as to whether she was terminated solely on the basis of Defendant's blanket policy by noting that Dr. Buchanan referenced the policy in the report he prepared immediately following her evaluation and did not mention that she posed a safety risk. However, this is not an accurate representation of the evidence. First, while Dr. Buchanan's report references the policy, it also sets forth an account of Plaintiff's medical history and details about the June 21 incident. Second, Dr. Buchanan put forth a safety rationale in Plaintiff's clearance letter, drafted one week after the incident, noting that her "[s]eizure disorder render[ed] [her] *unsafe* in hazardous duty work." (Doc. 33-8 at 15.) Lastly, Dr. Buchanan's sworn affidavit and deposition testimony both establish that the policy was just one factor among many he considered when determining Plaintiff's fitness for duty. His sworn statements show that he also thoroughly considered Plaintiff's individual medical condition

before finding that her particular disorder created a safety and security risk in the prison environment. (Doc. 33-8 at ¶¶ 9–12; Doc. 49-1 at 6–13, 15, 17–18.)

That Plaintiff notes additional inquiries into her condition that Dr. Buchanan could have made does not change the court's finding. Simply put, there is no evidence to support Plaintiff's assertion that Defendant strictly and automatically applied its seizure policy to her in a blanket fashion. To the contrary, Dr. Buchanan conducted a thorough and individualized assessment of Plaintiff's particular condition.

**3. Existence of a Reasonable Accommodation**

Last, the court notes that Plaintiff has not met her burden in establishing the existence of a reasonable accommodation that would have eliminated the direct threat posed by her seizure disorder and enabled her to continue working in the prison environment. *See Hodges v. Holder*, 547 F. App'x 6, 8 (2d Cir. 2013) ("[T]he plaintiff bears the burden of both production and persuasion as to the existence of some accommodation that would allow [her] to perform the essential functions of [her] employment." (internal quotation marks and citation omitted)).

The only accommodation identified by Plaintiff is the ability to use her sick time in the event she had a seizure. However, this accommodation does not eliminate the safety and security risk posed by her disorder. It does not address, much less eliminate or reduce, the risk of her experiencing another *unanticipated* seizure while working in the hazardous-duty prison environment. As Plaintiff has failed to establish the existence of a reasonable accommodation that would eliminate the direct threat posed by her disorder, she has not demonstrated that she was "otherwise qualified" for the position of CSW at York. Accordingly, Plaintiff's prima facie case of discrimination fails as a matter of law and Defendant is entitled to summary judgment.

## Conclusion

Defendant's Motion for Summary Judgment (Doc. 33) is GRANTED.

Dated this 1st day of September, 2016.

/s/ Geoffrey W. Crawford, USDJ

Geoffrey W. Crawford, Judge
United States District Court